UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CARRIE STEPHENSON

                Plaintiff,                                   Case No. 11-12681
                                                         Honorable Thomas L. Ludington

    v.

CENTRAL MICHIGAN UNIVERSITY, et al.,

                Defendants.

_____/

**OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

During the 2008–2009 school year, Plaintiff Carrie Stephenson was enrolled in the graduate speech pathology program at Central Michigan University (CMU). In the spring of 2009, she earned a failing grade and was dismissed from the program. She did not appeal her grade through CMU's grievance process. She did not meet with her instructors or the department chair or the dean. She filed this lawsuit.

Although CMU was originally a Defendant in this case, it has since been dismissed. The remaining Defendants are all members of CMU's speech pathology faculty. Kathryn Atkinson, Jane Jack, Sue Lea, Dr. Suzanne Woods, and Dr. Renny Tatchell were Plaintiff's instructors. Dr. Roger Coles is the Interim Dean for CMU's College of Graduate Studies. Plaintiff claims that when she received a failing grade and was dismissed from CMU's program, these individuals were retaliating against her for speaking her mind, and thereby violated her due process rights.

As explained below, this is not the case. Defendants' motion for summary judgment will be granted, and their motion to exclude Plaintiff's expert is denied as moot.

# I

In the fall of 2008, Plaintiff enrolled in the Speech-Language Pathology master's degree program (SLP) at CMU.  Def.'s Mot. Ex. 1, at 46.  She lived in Big Rapids at the time, an hour away from campus.  *Id*. at 47.  As a part of SLP, Plaintiff was assigned to a clinical practicum requiring six-hour time blocks on Tuesdays and Thursdays.  *Id*. at 46.  However, Plaintiff raised a scheduling conflict, noting it would be "difficult to make the hour-long drive" to CMU's campus on those days.  *Id*. at 47.  Instead, she requested a clinical assignment on Monday, Wednesday, and Friday.  *Id*.  When told the clinical assignments would not be changed, Plaintiff called Jane Jack, the Director of Clinical Instruction for SLP, Def.'s Mot. Ex. 26, at 2, and explained her predicament.  Def.'s Mot. Ex. 1, at 47.  During the conversation Ms. Jack questioned Plaintiff's future with the program.  *Id*. at 48.  Plaintiff felt Ms. Jack had "threatened" her removal, and considered not going to class at all.  *Id*.  Eventually, Ms. Jack accommodated Plaintiff's request, and she decided to continue with the program.  *Id*. at 49.  Then in December, Plaintiff moved to Mount Pleasant, Michigan, where CMU is located.  *Id*. at 49.

During the spring semester of 2009, Plaintiff continued with her SLP studies.  She enrolled in three classroom courses and one clinical practicum course.  Def.'s Mot. 1.  The practicum required direct work with patients under instructor supervision.  *Id*.  Plaintiff's instructors, all certified speech-language pathologists, were Katie Atkinson, Sue Lea, and Dr. Ann Ratcliff.  *Id*.  Plaintiff's classroom teacher was Theresa Jones.  *Id*.  Plaintiff was placed under the direct supervision of Ms. Atkinson, Def.'s Mot. Ex. 1, at 50, and assigned to a client, J.C.[1]  *Id*. at 51.  Plaintiff worried about her abilities and lack of experience.  She was concerned

---

[1] Patient names are represented as initials for confidentiality purposes.

that J.C. was not receiving the proper care because she was only a "beginning student."  *Id.* at 54.

Plaintiff shared her concerns with Ms. Atkinson, *id.* at 52, but did not tell anyone else.  *Id.* at 54.

Plaintiff did not have any other problems with the program during January and February of 2009, but she continued to worry she was not "meeting the clients' needs."  *Id.* at 64.  At the end of February, Plaintiff requested Wednesdays off so she would have more time to "work and study."  *Id.* at 60.  The request could not be granted.  *Id.*  In March, Plaintiff was assigned a new client, K.A.  *Id.* at 61.  K.A. was very anxious, depressed over her condition, and Plaintiff worried she was too inexperienced to help.  *Id.* at 65.  Ms. Atkinson assured Plaintiff that the two of them would work with K.A. together.  Def.'s Mot. Ex. 1, at 86.

During the summer after their first year, graduate students like Plaintiff are required to work full-time in a summer clinic.  Pl.'s Email (March 20, 2009), ECF No. 21, Ex. 1.  Plaintiff requested to work half-days so that she could also run her own business.  *Id.*  Ms. Jack responded that the clinical work required full days, Monday through Friday.  *Id.*  Ms. Jack did offer the opportunity to work the following summer instead.  *Id.*

Five days later, Plaintiff arrived for her clinical session unprepared.  She administered the wrong standardized test for K.A.  Def.'s Mot. Ex. 8.  Plaintiff met with Ms. Atkinson that afternoon, reiterated her concerns about her ability, and said she "didn't feel [she] could competently do" her clinical work.  Def.'s Mot. Ex. 1, at 86.

Plaintiff was next scheduled to work with K.A. on March 30, 2009, at 9:00 a.m.  Def.'s Mot. 3.  She was also scheduled to see another client at 10:00 a.m. with Ms. Lea.  Def.'s Mot. Ex. 1, at 112.  At some point before her appointments, Plaintiff decided that she was not going in to work.  *Id.* at 96.  Because she was only "a student learning," Plaintiff felt that K.A. was not under her direct care.  *Id.* at 102.  She assumed K.A. would be taken care of by "[w]hoever was

- 3 -

assigned that day." *Id*. at 103. So on March 30, 2009, at 7:18 a.m., Plaintiff sent the following email to Ms. Atkinson: "Katie, I am unable to make it to the clinic today." Def.'s Mot. Ex. 12. Aside from her name, she wrote nothing else. Plaintiff also emailed Ms. Lea to cancel her 10:00 a.m. appointment. She wrote, "Hi Sue, I am unable to make it to the clinic today. I know you planned on working with S.S. today so I hope everything goes well. I am sorry for the short notice." Def.'s Mot. Ex. 13. Plaintiff did not email Ms. Lea hours earlier when she emailed Ms. Atkinson, just after 7:00 a.m. She sent the email at 9:51 a.m., only nine minutes before her scheduled appointment. *Id*. Due to Plaintiff's short notice, both K.A. and S.S. were sent home without receiving treatment. Def.'s Mot. Exs. 1, at 118; 4, at 48. Ms. Atkinson wrote in an email Plaintiff's actions threw the entire clinic into "potential chaos." Pl.'s Resp. Ex. 3, at 7.

Plaintiff eventually made it to campus that day. Def.'s Mot. Ex. 1, at 119. She placed notes from her clinical sessions, along with discharge papers from her work with J.C., in Ms. Atkinson's mail slot. *Id*. at 119-20. Plaintiff also left all of K.A.'s testing materials. E-mail from Kathryn Atkinson (March 30, 2009), ECF No. 21 Ex. 2, at 1. Ms. Atkinson emailed Plaintiff to inquire about the delivery. *Id*. She noted that all the paperwork was incomplete, and asked for clarification. *Id*. Plaintiff responded, only five minutes later, that she was "not continuing with the program." E-mail from Plaintiff (March 30, 2009), ECF No. 21 Ex. 2, at 2. Ms. Atkinson then expressed frustration to Ms. Jack concerning Plaintiff's failure to finalize her notes before "dropping out of the program." E-mail from Kathryn Atkinson (March 30, 2009), ECF No. 21 Ex. 2, at 2. Plaintiff then skipped a meeting with Dr. Ratcliff on March 31, and left a "load of INCOMPLETE paperwork" in her mail file as well. Def.'s Mot. Ex. 15.

Marie Kenworthy, an undergraduate student assigned to "shadow" Plaintiff during the clinical sessions, commented on Plaintiff's work. Def.'s Mot. Ex. 47, at 2. She said working

- 4 -

under Plaintiff was "very disappointing." *Id*. According to Ms. Kenworthy, Plaintiff was "unprofessional, unprepared and not sure of herself." *Id*. Ms. Kenworthy also commented on the March 30 events. She said Plaintiff "failed to show up for [a] meeting without any prior notice to me or to the client. [Plaintiff] also failed to show up for the next scheduled meeting without giving the client or me advance notice and without arranging for another clinician to take care of the client. [Plaintiff] abandoned the client." *Id*. During the sessions Plaintiff actually attended, Ms. Kenworthy wondered if Plaintiff "had done any preparation at all." *Id*. at 3. After Plaintiff "dropped out of the program," Ms. Kenworthy was assigned a new graduate mentor. *Id*. at 4. "The difference between the second clinician and [Plaintiff] was night and day." *Id*. During her remaining time with SLP, each of the three clinicians Ms. Kenworthy worked with were "far superior to [Plaintiff]." *Id*. They were "far superior to [Plaintiff] in their professionalism, their preparation and the caring for the client they exhibited." *Id*. at 5.

As Ms. Kenworthy noted, Plaintiff did not arrange for other clinicians to care for her clients on March 30. As a part of her orientation, Plaintiff went through training for the SLP program. Def.'s Mot. Ex. 2, at 14. Plaintiff was given a handbook at that time, outlining SLP's clinical procedures. *Id*. That handbook expressly provides that absent an emergency, graduate student clinicians "*must* personally arrange for a peer clinician to assume responsibility for assigned evaluation or therapy session." SLP Handbook, ECF No. 21, Ex. 4, at 2 (emphasis added). "Failure to meet or provide alternate coverage for an assigned appointment is viewed as 'patient abandonment' which will result in verbal reprimand, lowering of a grade, or removal from clinical assignments." *Id*. at 3. The handbook also establishes, "In the event of non-emergency circumstances, service delivery options must be discussed with the supervisor and Director of Clinical Instruction and Services in Speech-Language Pathology twenty-four (24)

hours prior to the scheduled session." *Id.* (emphasis in original).  Plaintiff did not give twenty-four hours' notice.  She gave nine minutes.

"Failure to participate in scheduled sessions is viewed as an act of patient abandonment. Every effort must be made to provide ongoing services with minimal interruptions relative to time, frequency, task, etc.  Failure to follow these guidelines may result in a reduction of the clinical grade or recommendation . . . for dismissal from clinical assignments." *Id.*

On March 31, 2009, Ms. Jack reached out to Plaintiff regarding her decision to withdraw from the program.  E-mail from Jane Jack (March 31, 2009), ECF No. 21, Ex. 3, at 1.  She also offered to set up a meeting.  *Id.*  Plaintiff responded that she was "in the process of withdrawing from [the] program."  E-mail from Plaintiff (March 31, 2009), ECF No. 21, Ex. 3, at 2.  She disclosed that family and work obligations, in addition to not realizing her "reasonable requests regarding scheduling," aided her decision to withdraw.  *Id.*  Plaintiff added she was unable to continue based on what she called "ethical misconduct."  *Id.*  She asked for the procedures to file a grievance, but never identified who she was implicating, or what she was referring to.  *Id.*

Dr. Suzanne Woods also reached out to Plaintiff on March 31.  She called plaintiff, and left a phone message.  Def.'s Mot. Ex. 16, at 2.  She also sent an email due to the "seriousness of the situation."  *Id.*  Dr. Woods asked for an explanation of Plaintiff's actions.  *Id.*  She asked if Plaintiff was withdrawing.  *Id.*  Dr. Woods commented that Plaintiff's actions were "surprising" and "unprofessional."  *Id.*  "You have responsibilities to clients that given no notice, have resulted in an interruption of care.  In ethical terms this is patient abandonment. . . . Please contact Pam Iacco to set up a meeting with Dr. Tatchell, Ms. Jack and me."  *Id.*  Plaintiff responded that she had "already started the withdrawal process from the Registrar," and asked to be contacted only by "written letter" or "email."  *Id.* at 1.  She also claimed that it was the lack of

professionalism in the program that caused her decision not to continue. *Id*. Dr. Woods responded, offering another chance to meet to discuss any problems. *Id*. Plaintiff did not respond that day, but instead went to the registrar's office and withdrew from all her classes. Def.'s Mot. Ex. 1, at 192-93.

When asked about her statements concerning professionalism and misconduct at her deposition, Plaintiff testified she was only referring to Ms. Atkinson. Def.'s Mot. Ex. 1, at 135. When asked what specific behavior concerned her, Plaintiff testified that "Ms. Atkinson had difficulty meeting at her meetings. She didn't have time, she had stated." *Id*. at 137. She also claimed that Ms. Atkinson appeared to be crying on one occasion. *Id*. Finally, Plaintiff was concerned that Ms. Atkinson was not present to supervise two of her sessions with clients. *Id*. at 139. Those were the only causes for concern that Plaintiff could recall. *Id*. at 140.

On April 1, 2009, Plaintiff responded to Dr. Woods' request. Although Dr. Woods had suggested a meeting, Plaintiff wrote, "I will not be able to discuss the issue further with you until April 16." Def.'s Mot. Ex. 18. Dr. Woods wrote again on April 1, telling Plaintiff, "Waiting to meet is not acceptable" based on the seriousness of what Plaintiff had suggested. Def.'s Mot. Ex. 19, at 1. Dr. Woods asked for a meeting before the end of the week, or at least a written summary of Plaintiff's concerns. *Id*. Plaintiff responded the next day that she was "unable to comply" with the request for a written summary or a meeting. Def.'s Mot. Ex. 20, at 2. At her deposition, Plaintiff testified she did not know why she refused to meet until April 16, and that she had no pressing matters to attend to. Def.'s Mot. Ex. 1, at 198-99.

After Plaintiff withdrew from all her classes on March 31, the registrar's office requested her grades on April 2. Because Plaintiff withdrew after March 27, she needed at least a "C-" grade or better to receive a "W" (withdrawn) on her transcript. Def.'s Mot. Ex. 35, at 43. A

"W" does not affect a student's Grade Point Average (GPA).   Students with below a "C-" receive an "E" on their transcripts, a failing grade, which does affect their cumulative GPA.

Ms. Jack had begun the process of assessing Plaintiff's grade shortly after Plaintiff confirmed she was withdrawing on March 31.  Ms. Jack met with Ms. Lea that day, and was told Plaintiff deserved an "E" for her portion of the clinic.  Def.'s Mot. Ex. 4, at 50, 68.  Ms. Lea did not penalize Plaintiff for withdrawing, only for "not completing the standards that were set before her" in SLP's guidelines and standards of practice.  *Id.* at 68.  Ms. Jack then talked to Ms. Atkinson on April 1. 2009.  Def.'s Mot. Exs. 3, at 63; 5, at 112.  Ms. Atkinson delivered an "E" as well, because Plaintiff was "not functioning as expected when compared to her peers at the same clinical experience level."  Pl.'s Resp. Ex. 6, at 8.  Ms. Jones emailed Ms. Jack, and told her that Plaintiff had a 100% for the classroom portion of the clinical.  Pl.'s Resp. Ex. 4, at 3.  Although Plaintiff received a 100% from the classroom portion of the class, when it was averaged with her clinical work, she received an "E" overall.  Pl.'s Resp. Ex. 4, at 4.  Ms. Jack said the grade was deserved "given [Plaintiff's] untimely presentation of required/reviewed documentation and the associated 'abandonment' of responsibility to the client…including completion of documentation."  *Id.* at 4.  Ms. Jack also considered the SLP requirements established by the Clinical Handbook, professional guidelines, and Technical Standards that applied to graduate students.  Def.'s Mot. Ex. 26, at 3.  After Plaintiff received her grade, she emailed Ms. Jack on April 7.  She requested an explanation for the "E" "via written letter or email."  Pl.'s Resp. Ex. 5, at 4.  Ms. Jack did not respond, but forwarded the email to Dr. Woods and Dr. Tatchell, the SLP department chair.  *Id.* at 5.

Days before, on April 3, 2009, Dr. Tatchell contacted Dr. Roger Coles, the Interim Dean of the College of Graduate Studies at CMU.  Dr. Tatchell recommended Plaintiff be dismissed

from the SLP program because she had failed to meet the program's required technical standards, and had earned a failing grade in her practicum. Def.'s Mot. Ex. 37. Dr. Tatchell was convinced that Plaintiff's conduct constituted "patient abandonment" under the terms of the Clinical Handbook. Def.'s Mot. Ex. 6, at 58, 74. Dr. Tatchell would have been open to Plaintiff's explanation before he recommended Plaintiff's dismissal, *id.* at 74, but, as previously noted, Plaintiff refused to meet with him. Def.'s Mot. Ex. 20, at 3.

Dean Coles received Dr. Tatchell's recommendation, and called to ensure his position. Def.'s Mot. Ex. 7, at 11-12. After Dr. Tatchell confirmed his recommendation that Plaintiff be dismissed, Dean Coles proceeded to accept the recommendation and dismissed Plaintiff from SLP. *Id.* at 12. At that time, Dean Coles had no knowledge that Plaintiff had made any comments about professionalism in the SLP program. Def.'s Mot. Ex. 39, at 2. Plaintiff was then informed of her dismissal in an April 10, 2009 letter from Dean Coles. Def.'s Mot. Ex. 38.

Then, on April 14, Plaintiff finally provided the written summary that had been requested almost two weeks earlier. She emailed Dr. Tatchell and explained her concerns with the program. Pl.'s Mot. Ex. 6, at 1-2. Plaintiff stated that she did not receive enough guidance and supervision from Ms. Atkinson, and "had lost all confidence" in her ability to complete her clinical tasks. *Id.* at 2. She also demanded that her "E" be changed to a "W", with "no further action," and that she could then "close this brief chapter in [her] life." *Id.*

Plaintiff then called Dr. Tatchell on April 15, 2009. Pl.'s Resp. Ex. 8, at 2. He explained why she had received an "E" on her transcript, and directed her to the grade-grievance process at CMU. *Id.* Dr. Tatchell also received a voicemail from Plaintiff's husband, who threatened to take Plaintiff's issues to the dean and the "hiring/firing department in the university." *Id.*

- 9 -

On April 16, 2009, Plaintiff emailed Dr. Tatchell and informed him "the grade grievance policy" was not a valid option for her. *Id*. at 4. Dr. Tatchell responded that it was entirely Plaintiff's choice whether she pursued that avenue. *Id*.

## II

Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P.* 56(c). The focus must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986). All justifiable inferences from the evidence must be drawn in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Specific to this case, "When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Bell v. Ohio State University*, 351 F.3d 240, 251 (6th Cir. 2003) (quoting *Regence of the University of Michigan v. Ewing*, 474 U.S. 214, 225 (1985)).

## III

Plaintiff asserted three claims against Defendants in her complaint. ECF No. 1. She claims that she was dismissed from the SLP program in violation of her rights to free speech, equal protection, and due process. As noted in Plaintiff's Response, she has abandoned her equal protection claim. Pl.'s Resp. 20. Her remaining claims will be assessed in turn.

**A**

Plaintiff first claims that Defendants retaliated against her for constitutionally protected speech. To support such a claim, Plaintiff must show the following elements:

> (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury likely to chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

*Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998) (citing *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274 (1977)). If Plaintiff establishes that her protected conduct was a motivating factor behind her poor grade or dismissal, the burden shifts to Defendants. *Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274 (1977)). If Defendants can show that they would have taken the same action in the absence of the protected activity, they are entitled to summary judgment. *Thaddeaus-X*, 175 F.3d at 399.

Plaintiff's complaint outlines two "protected activities" she claims were the basis of retaliation by Defendants: (1) raising ethical concerns about her educational experiences, the quality of patient care, and the conduct of her supervisors; and (2) questioning her grades, the conduct and motives of her instructors in giving her those grades, and the conduct of Defendants in responding to the concerns she raised. Pl.'s Compl. 11, 16.

**i**

Ms. Jack indicated Plaintiff would receive an "E" grade for the semester on April 2, 2009, at 10:19 a.m. Pl.'s Resp. Ex. 4, at 3. For a retaliation claim to ensue from this grade, Plaintiff must have raised some form of ethical concerns about her educational experiences, patient care, or conduct of her supervisors before that time.

The evidence shows that on March 30, 2009, Plaintiff wrote three emails. None of the emails refer to anything aside from the fact that she would not make her clinical appointments, and that she was withdrawing from the program. No action for retaliation can arise from these statements.

On March 31, 2009, Plaintiff wrote two emails. At 10:01 a.m. she wrote to Ms. Jack, "I am troubled by conduct I have experienced by certain professionals in the program. I do not feel I am able to continue participation based on what I feel very well could be ethical misconduct. Please inform me of the following procedures to file a grievance." Pl.'s Resp. Ex. 2, at 6. At 11:22 a.m., Plaintiff emailed Dr. Woods. She wrote, "It is the matter of 'professionalism' or lack thereof, that has aided my decision to not continue in your program. I am very concerned about the conduct of some of the 'professionals' in your program and wish not to continue under their direction. . . . Please advise me of the formal grievance process . . ." *Id*. at 7.

On April 1, Plaintiff wrote only one email, to Ms. Lea. It included nothing relevant for our determination of this issue, only that she was unable to discuss her withdrawal until April 16. Pl.'s Mot. Ex. 3, at 3. Accordingly, only Plaintiff's March 31 emails could be the source of her retaliation claim.

However, Plaintiff has failed to show how these two emails impacted her grade in any way. Neither emails was written to her actual grading instructors — Ms. Atkinson, Ms. Lea, Ms. Jones, or Dr. Ratcliff. While Ms. Jack had the final authority over her grade, she computed it based on what the grading instructors provided. Ms. Jones gave Plaintiff a 100% for her classroom work. Plaintiff received a 65% for Ms. Atkinson's portion of the clinical work, Def.'s Mot. Ex. 22, at 3, and a 29% from Ms. Lea. Def.'s Mot. Ex. 23, at 3. Dr. Ratcliff gave no percentage, only indicated Plaintiff was doing "satisfactory" work. The average of 100, 65, and

- 12 -

29 is below 65%.  Under CMU's graduate school policy, this percentage receives an "E" if the class is dropped after the tenth week of the semester.  Def.'s Mot. Ex. 35, at 43.

Even if Plaintiff's emails *were* known to the grading instructors, the nature of the emails does not support a claim for retaliation.  Plaintiff's message was vague and cryptic.  This fact is evident from Defendants' responses.

Dr. Woods responded to Plaintiff's email by saying, "It would be very helpful to have clarification of the concern you have about 'lack of professionalism' and what you mean by your use of the term 'grievance'."  Pl.'s Resp. Ex. 2, at 7.  Dr. Woods went on to write, "Feel free to respond in writing or we can discuss this in the meeting with Dr. Tatchell, Ms. Jack and me as I alluded to in my previous email.  Pam Iacco is aware of our calendars and is expecting to hear from you so that a meeting can be scheduled as soon as possible.  Please contact her as soon as possible."  *Id*.  The next day, when Plaintiff did not respond, Dr. Woods contacted her again.  "Please call Pam Iacco . . . . It is very important that you schedule a meeting for one of those days."  Pl.'s Resp. Ex. 3, at 3.

Dr. Woods also emailed Dr. Bradford Swartz, CMU's Interim Associate Dean.  She told him about Plaintiff's withdrawal, noting, "This has been a surprise to us all."  *Id*. at 4.  She also wrote that she was in to process "of setting up a meeting with [Plaintiff] to discuss whatever her concerns are to result in withdrawal."  *Id*.  Dr. Swartz responded, "This is an unfortunate occurrence and I will be curious about what caused her sudden change of mind and heart.  I know that part of your meeting with her will entail any complaints she might have.  If she has some complaint against any regular faculty member, please notify me . . ."  *Id*. at 4.

Later on April 1, Dr. Woods again emailed Plaintiff, telling her that "[w]aiting to meet is not acceptable." Pl.'s Resp. Ex. 3, at 8. She asked Plaintiff to set up an appointment, or to at least submit a written complaint. *Id.* Plaintiff refused both suggestions. Pl.'s Resp. Ex. 4, at 7.

Plaintiff believes *Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012), supports her claim of retaliation. But that case was different than the one before this Court. There, the plaintiff expressed exactly what her views were — that she would not counsel homosexual clients about their relationships — and those views were *known* to the faculty that expelled her. As the court noted, "The free-speech clause generally prohibits suppressing speech 'because of its message.'" *Id.* at 733. In this case, it was wholly unclear what Plaintiff's message was when she referred to the lack of "professionalism" in the clinic. She did not refer to any specific faculty member, she did not refer to any specific incident. Plaintiff simply has not shown Defendants were aware of what her message was, and that is why she received a poor grade. Defendants' responsive emails indicate a general air of confusion. Plaintiff's message was unknown when she received her grade; such a message does not support a First Amendment claim for retaliation.

Plaintiff's claim for retaliation is even less stable when her actual complaints are identified. Plaintiff testified her statements only related to Ms. Atkinson. Def.'s Mot. Ex. 1, at 135. The specific behavior that concerned her was Ms. Atkinson's alleged unavailability, one emotional episode, and that Ms. Atkinson did not supervise two of Plaintiff's clinical sessions. *Id.* at 139. Those were Plaintiff's only concerns. *Id.* at 140.

In *Heenan v. Rhodes*, 757 F.Supp.2d 1229, 1240-41 (M.D. Ala. 2010), the district court refused to protect speech that boiled down to "an effort by a student to get judicial review of her academic performance through a First Amendment claim that her gripes . . . warrant such review. . . . These gripes, whether voiced privately or openly, are generally not constitutionally protected

- 14 -

speech subject to court review."  Plaintiff here was simply responding to accusations that she had acted unprofessionally and abandoned her clients.  Her "gripes" are not protected.

Further, Plaintiff's instructors acted directly in line with CMU policy.  The Clinical Handbook maintains, "Failure to participate in scheduled sessions is viewed as an act of patient abandonment. . . . Failure to follow these guidelines may result in a reduction of the clinical grade or recommendation . . . for dismissal from clinical assignments." SLP Handbook, ECF No. 21, Ex. 4, at 3.  Plaintiff abandoned her clients, and the instructors lowered her grade because of it.  Just as the handbook warned they would.

CMU expressly recognizes that "it is the instructor's prerogative to determine a grade." Pl.'s Resp. Ex. 15 at 45.  The Sixth Circuit has as well.  A teacher has "broad authority to base her grades for students on her view of the merits of the students' work." *Settle v. Dickson County Sch. Bd.*, 53 F.3d 152, 155 (6th Cir. 1995) (citing *Board of Curators of the Univ. of Mo. v. Horowitz,* 435 U.S. 78 (1978)).  "Grades must be given by teachers in the classroom, just as cases are decided in the courtroom. . . . Teachers therefore must be given broad discretion to give grades . . ." *Settle*, 53 F.3d at 155-56.  Each of Plaintiff's instructors expressly maintained the grade she received was based on her merit in the classroom, not on any other factor.  Def.'s Mot. Exs. 27, at 4; 28, at 2; 29, at 3.  These decisions were substantiated by the undergraduate student who observed Plaintiff's work.  Marie Kenworthy maintained that Plaintiff was unprofessional and unprepared — easily outclassed by the other SLP graduate students.  Def.'s Mot. Ex. 47, at 2–5.

Finally, even if Plaintiff could meet her burden on this issue, Defendant would still be entitled to summary judgment because they would have taken the same action in the absence of the protected activity.  *Thaddeaus-X*, 175 F.3d at 399.  When another CMU student suddenly

quit an SLP clinical course, missing scheduled appointments with clients in a way that constituted "client abandonment," she was treated exactly the same as Plaintiff. Def.'s Mot. Exs 26, at 7; Ex. 29, at 2; Ex. 48, at 5–6; Ex. 6, at 16. That student received an "E" in the course, just as Plaintiff did.

### ii

Plaintiff claims her dismissal was retaliation as well. However, the Sixth Circuit has expressly held that judicial review of academic decisions, including those with respect to a student's dismissal, are "rarely appropriate." *Megenity v. Stenger*, 27 F.3d 1120, 1125 (6th Cir. 1994) (quoting *Ewing,* 474 U.S. at 230). As with her previous claim, Plaintiff's argument that she was dismissed in retaliation for her speech lacks merit.

Aside from two emails on April 2, there was no additional communication between Plaintiff and Defendants before they recommended her dismissal on April 3, 2009. On April 2, Plaintiff emailed Dr. Woods twice. Plaintiff first told Dr. Woods she would return disks with patient information "immediately." Pl.'s Resp. Ex. 4, at 5. In the second email, Plaintiff said she was "unable to comply with your request for a written summary or a meeting at this time." *Id*. at 6. Aside from showing Plaintiff's unwillingness to discuss any "concerns" she may have had, these communications are not relevant to Plaintiff's claim. She was not questioning "the conduct and motives of her instructors" in a way that could lead to retaliatory action.

Just like Defendants did not deliver Plaintiff a poor grade because of her speech, they did not dismiss her because of her speech. They did so because she failed to abide by the SLP program guidelines, as discussed above.

As before, even if Plaintiff could meet her burden on this issue, summary judgment is warranted because Defendants would have taken the same action in the absence of any protected

activity.  *Thaddeaus-X*, 175 F.3d at 399.  When another CMU student suddenly quit a clinical course, abandoning her client, she was asked to leave the SLP program.  Def.'s Mot. Exs 26, at 7; 29, at 2; 48, at 5–6; 6, at 16.

**B**

Plaintiff next claims that Defendants' actions violated her due process rights.  Defendants took two actions — delivered Plaintiff an "E" for her clinical practicum grade, and dismissed her from the SLP program.

There is no need to tarry long with the first point.  Plaintiff's work in her clinical practicum justified an "E" grade.  Course grading called for an average of the student's overall work.  Ms. Jones gave Plaintiff a 100% for her classroom work.  She received a 65% from Ms. Atkinson and a 29% from Ms. Lea.  Def.'s Mot. Exs. 22, at 3; 23, at 3.  Dr. Ratcliff gave no percentage, only indicated Plaintiff was doing "satisfactory" work.  The average of 100, 65, and 29 is just under 65%.  Under CMU's graduate school policy, 65% is a failing grade that merits an "E" if the class is dropped after the tenth week.  Def.'s Mot. Ex. 35, at 43.  Plaintiff has not shown how Dr. Ratcliff's "satisfactory" assessment would change that average.

Further, even if Dr. Ratcliff's assessment would have bumped Plaintiff's grade above 70%, her actions on March 30 clearly fall within the SLP handbook's definition of "patient abandonment."   According to the handbook, patient abandonment *will* result in "verbal reprimand, lowering of a grade, or removal from clinical assignments."   SLP Handbook, ECF No. 21, Ex. 4, at 3.  As noted above, teachers "must be given broad discretion to give grades." *Settle*, 53 F.3d at 156.  The evidence shows that Plaintiff's instructors were within their authority in giving her a failing grade, and that grade is supported by the evidence.

If Plaintiff wanted to appeal her grade, she had ample opportunity.  After Plaintiff first complained, Dr. Tatchell emailed her about the grade grievance procedure.  "I wanted you to know you have the right to appeal your grade through the grade grievance process at CMU.  You should check page 45 of the graduate bulletin (2008-2009) for details on the grade grievance policy.  Let me know if you have any questions."  Pl.'s Resp. Ex. 6, at 4.  Plaintiff responded, "I feel the grade grievance policy is not a valid option at this time."  Pl.'s Resp. Ex. 8, at 4.  Dr. Tatchell later reminded Plaintiff of the grievance policy.  "As far as the grade grievance is concerned, I outlined the steps you can take.  It is entirely up to you whether or not you initiate the process."  *Id*.  Plaintiff's allegation that she was "[c]ompletely and utterly frustrated in her attempts to appeal her grade," Pl.'s Compl. 13, are without merit.  As the evidence shows, she was given ample opportunity to appeal — she chose not to.

Plaintiff next opposes her dismissal, claiming she had a fundamental right and interest in continuing her education.  Pl.'s Compl. 12.  The substantive due process clause protects against "government interference with certain fundamental rights and liberty interests."  *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).  When performing a substantive due process analysis, the court must narrowly formulate the asserted right.  *Galdikas v. Fagan*, 2001 WL 1223539 (N.D. Ill. Oct. 12, 2001).  After formulating the asserted right, the court must ask whether it is "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it was] sacrificed."  *Washington*, 521 U.S. at 720-21 (citations omitted).

Plaintiff's asserted right is an accredited graduate school education.  "Although students may have some substantive due process rights while they are in school, education itself is not a fundamental right."  *Dunn v. Fairfield Cmty. High Sch. Dist. No. 225*, 158 F.3d 962, 966 (7th

Cir. 1998).  Moreover, the right to a graduate school education is not deeply rooted in this nation's history and traditions.  "In fact, the Supreme Court has held explicitly that the right to attend public school is not a fundamental right for the purposes of due process analysis."  *Seal v. Morgan*, 229 F.3d 567, 575 (6th Cir. 2000).  Plaintiff's substantive due process claim concerning her dismissal is untenable.

To determine if Plaintiff has established that her procedural due process rights have been violated, the court must engage in a two-step inquiry.  First, whether a liberty or property interest has been interfered with by the state, and second, whether the procedure used to deprive Plaintiff of such interest was constitutionally sufficient.  *Yohn v. Coleman*, 639 F.Supp.2d 776, 787 (E.D. Mich. 2009).  The fundamental elements of procedural due process are notice and an opportunity to be heard.  *Id.* at 788 (quoting *Yellow Freight Sys., Inc. v. Martin*, 954 F.2d 353, 357 (6th Cir. 1992).

*Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78 (1978), establishes the standard for procedural due process in the context of academic decisions.  There, the plaintiff was dismissed for academic reasons without receiving a hearing.  *Id.* at 79-80.  The Court, without deciding whether the plaintiff had a protected liberty or property interest in continuing her education, rejected her argument. The Court held that, when dismissing a student for academic reasons, a university need not hold a hearing.  *Id.* at 85, 89-91.  A university meets the requirements of procedural due process so long as the dismissal decision is "careful and deliberate."  *Id.* at 85.

Defendants were careful, and they were deliberate.  Plaintiff was offered meetings in which to explain her actions on numerous occasions.  Indeed, Defendants begged her to meet with them.  Dr. Woods asked Plaintiff to set up a time to discuss her claims on March 31, April

1, and April 2.  Pl.'s Resp. Exs. 2–4.  Plaintiff responded that she was not able "to discuss the issue further" until April 16.  Pl.'s Resp. Ex. 3, at 3.  Dr. Woods told Plaintiff that "[w]aiting to meet is not acceptable."  *Id*. at 8.  She asked Plaintiff to set up an appointment, or to at least submit a written complaint.  *Id*.  Plaintiff refused.  Pl.'s Resp. Ex. 4, at 7.  Dr. Tatchell, who ultimately recommended Plaintiff's dismissal, testified concerning those potential meetings:

> [Plaintiff] had an opportunity to come in.  In fact, she had an invitation from Dr. Woods to come in and talk to Jane Jack, Dr. Woods and myself.  And that meeting was, at least in my mind, was very much open-ended and concerned her leaving the program and as I say abandoning the clients.  And justification for making this recommendation was on the basis of many of the things that I've talked about . . .

Def.'s Mot. Ex. 6, at 74.  Before Dean Coles signed off on Plaintiff's dismissal, he called Dr. Tatchell to ensure the decision had been considered at length.  Def.'s Mot. Ex. 7, at 11-12.  Dr. Tatchell confirmed that it had been.  *Id*.  This is just the sort of careful, deliberate decision that is appropriate in the context of graduate education.

The letter Dean Coles then sent informing Plaintiff of her dismissal contained the following: "If you have any questions or there is any way that I can be of help to you, please do not hesitate to contact me."  Def.'s Mot. Ex. 38.  Plaintiff never did.  She had ample opportunity to be heard on the issue.  She simply never took that opportunity.

As noted at the outset, federal courts are not well-suited to evaluate the substance of academic decisions made by faculty members, decisions which require "an expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decision-making."  *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 226, (1985) (citation omitted).  "Courts must accept, as consistent with due process, 'an academic decision that is not beyond the pale of reasoned academic decision-making when viewed against the background of [the student's] entire career at the University.' "  *Moore v. Louisiana State*

*Univ. & Agric. & Mech. Coll.*, 275 F.3d 1083 (5th Cir. 2001) (quoting *Wheeler v. Miller,* 168 F.3d 241, 250 (5th Cir.1999) (citation omitted)).  Plaintiff has not shown her professors showed a lack of professional judgment.  Their decision to fail her, and then dismiss her, is supported by her work in class, her client-abandonment, and then her disinterest in meeting to discuss the issue.  Her procedural due process claim will be dismissed.

**IV**

Accordingly, it is **ORDERED** that Defendants' motion for summary judgment, ECF No.34, is **GRANTED**.

It is further **ORDERED** that Defendants' Motion in Limine to Exclude Plaintiff's Expert, ECF No. 50, is **DENIED** as moot.

It is further **ORDERED** that Plaintiff's Ex Parte Motion for Leave to File 30 Page Brief, ECF No. 61, is **DENIED** as moot.

It is further **ORDERED** that Plaintiff's complaint, ECF No. 1, is **DISMISSED** with prejudice.

This is a final order, and closes the case.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: September 25, 2012

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 25, 2012.

s/Tracy A. Jacobs
TRACY A. JACOBS

---