UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CARRIE STEPHENSON

           Plaintiff,                            Case No. 11-12681
                                                    Honorable Thomas L. Ludington

   v.

CENTRAL MICHIGAN UNIVERSITY, et al.,

           Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART DENYING IN PART
DEFENDANT'S MOTION FOR SANCTIONS**

During the 2008–2009 school year, Plaintiff Carrie Stephenson was enrolled in the graduate speech-language pathology program at Defendant Central Michigan University (CMU). In the spring of 2009, she earned a failing grade and was dismissed from the program. Plaintiff commenced this lawsuit in June 2011, asserting that Defendants violated her rights to Equal Protection and Due Process, and also retaliated against her for exercising her right to free speech.

Aside from CMU, the other Defendants are all members of CMU's speech pathology faculty. Kathryn Atkinson, Jane Jack, Sue Lea, Dr. Suzanne Woods, and Dr. Renny Tatchell were Plaintiff's instructors. Dr. Roger Coles is the Interim Dean for CMU's College of Graduate Studies. Plaintiff claims that these individuals retaliated against her for speaking her mind and violated her rights.

Defendants moved for summary judgment on May 30, 2012. Because Defendants' academic decisions did not represent a substantial departure from accepted academic norms so as to undermine their professional judgment, *see Regents of Univ. of Michigan v. Ewing*, 474 U.S.

214, 225 (1985), this Court granted Defendants' motion.  Defendants then brought a motion for

sanctions against Plaintiff, arguing as follows:

> Plaintiff has deliberately ignored her own inadequate and unsatisfactory academic
> and clinical performance, as well as her failure to satisfy CMU's established
> curricular requirements.  Plaintiff has done so in order to blindly assert, without
> any factual or evidentiary basis, that Defendants did not reasonably exercise their
> professional judgment in making genuine academic decisions, but instead
> retaliated against her based on her allegedly-protected speech that occurred *after*
> her inadequate and unsatisfactory academic and clinical performance.

Defs.' Mot. ¶ 7, ECF No. 79 (emphasis in original).  Defendants believe they should never have

been forced to defend against this case, and have asked for $141,428 in attorney's fees and

$11,577.82 in costs incurred during the course of litigation.

Plaintiff responded, arguing that sanctions are not appropriate.  She says there was

sufficient evidence to demonstrate a First Amendment retaliation claim and a denial of due

process claim, but that the facts have not been considered in the light most favorable to the

nonmoving party.[1]  Plaintiff concludes "her claim was made in good faith, with sufficient

evidentiary support, and warranted by existing law; and that sanctions are not warranted."  Pl.'s

Resp. 1, ECF No. 84.  Defendants' motion for sanctions will be granted in part and denied in

part.

# I

In the fall of 2008, Plaintiff enrolled in the Speech-Language Pathology master's degree

program (SLP program) at CMU.  During the spring semester of 2009, Plaintiff enrolled in three

classroom courses and one clinical practicum course.  The practicum required direct work with

patients under instructor supervision.

---

[1] As discussed below, Plaintiff abandoned her equal protection claim before the motion for summary judgment was addressed.

Plaintiff was scheduled to work with one of her patients, K.A.[2], on March 30, 2009, at 9:00 a.m.  She was also scheduled to see another patient at 10:00 a.m. with Ms. Lea.  At some point during the weekend before her Monday appointments, Plaintiff decided that she was not going to see her patients.  Because she was only "a student learning," Plaintiff felt that K.A. was not under her direct care.  She assumed K.A. would be taken care of by "[w]hoever was assigned that day."  Pl.'s Dep. at 103.  So on March 30, 2009, at 7:18 a.m., Plaintiff sent the following email to Ms. Atkinson: "Katie, I am unable to make it to the clinic today."  Defs.' Mot. Summ. J. Ex. 12.  Aside from her name, she wrote nothing else.  Plaintiff also emailed Ms. Lea to cancel her 10:00 a.m. appointment.  She wrote, "Hi Sue, I am unable to make it to the clinic today.  I know you planned on working with S.S. today so I hope everything goes well.  I am sorry for the short notice."  Defs.' Mot. Summ. J. Ex. 13.  Plaintiff did not email Ms. Lea when she emailed Ms. Atkinson — just after 7:00 a.m.  Instead, she sent the email at 9:51 a.m., only nine minutes before her scheduled appointment.  Due to Plaintiff's short notice, both K.A. and S.S. were sent home without receiving treatment.  Defs.' Mot. Summ. J. Exs. 1, at 118; 4, at 48.  Ms. Atkinson wrote in an email that Plaintiff's actions threw the entire clinic into "potential chaos."  Pl.'s Resp. Summ. J. Ex. 3, at 7.

Plaintiff eventually did make it to campus that day, albeit not for the patient appointments.  She placed notes from her clinical sessions, along with discharge papers from her work with a previous client, in Ms. Atkinson's mail box.  Plaintiff also left all of K.A.'s testing materials.  Ms. Atkinson then emailed Plaintiff to inquire about the delivery.  She noted that the paperwork was incomplete, and asked for clarification.  Plaintiff responded, five minutes later, that she was "not continuing with the program."  E-mail from Plaintiff (March 30, 2009), ECF No. 21 Ex. 2, at 2.  Ms. Atkinson then expressed frustration to Ms. Jack concerning Plaintiff's

---

[2] Client names are represented as initials for confidentiality.

failure to finalize her notes before "dropping out of the program."  E-mail from Kathryn Atkinson (March 30, 2009), ECF No. 21 Ex. 2, at 2.  Plaintiff missed her meeting with Dr. Ratcliff on March 31, and left a "load of INCOMPLETE paperwork" in her mail file as well. Defs.' Mot. Summ. J. Ex. 15.  During her deposition, Plaintiff indicated that she made the decision to withdraw from the program at some point between class on Friday, March 27 and the morning of Monday, March 30.  *See* Pl.'s Dep. 96–97.

Plaintiff did not arrange for other clinicians to care for her clients on March 30, or for the other days she was scheduled that week.  This was in direct conflict with her responsibilities as a student clinician.  As a part of her orientation, Plaintiff went through training for the SLP program outlining SLP's clinical procedures.  Defs.' Mot. Summ. J. Ex. 2, at 14.  The SLP clinical handbook provides that absent an emergency, graduate student clinicians "*must* personally arrange for a peer clinician to assume responsibility for assigned evaluation or therapy session."  SLP Handbook, ECF No. 21, Ex. 4, at 2 (emphasis added).  "Failure to meet or provide alternate coverage for an assigned appointment is viewed as 'patient abandonment' which will result in verbal reprimand, lowering of a grade, or removal from clinical assignments."  *Id*. at 3.  The handbook also establishes, "In the event of non-emergency circumstances, service delivery options must be discussed with the supervisor <u>and</u> Director of Clinical Instruction and Services in Speech-Language Pathology twenty-four (24) hours prior to the scheduled session."  *Id*. (emphasis in original).  Plaintiff did not give twenty-four hours' notice.  She gave nine minutes.

The handbook reiterates the consequences that could result from patient abandonment: "Failure to participate in scheduled sessions is viewed as an act of patient abandonment.  Every effort must be made to provide ongoing services with minimal interruptions relative to time,

frequency, task, etc.  Failure to follow these guidelines may result in a reduction of the clinical grade or recommendation . . . for dismissal from clinical assignments."  *Id*.

On March 31, 2009, Ms. Jack reached out to Plaintiff regarding her decision to withdraw from the program.  E-mail from Jane Jack (March 31, 2009), ECF No. 21, Ex. 3, at 1.  She also offered to set up a meeting.  *Id*.  Plaintiff responded that she was "in the process of withdrawing from [the] program."  E-mail from Plaintiff (March 31, 2009), ECF No. 21, Ex. 3, at 2.  She explained that family and work obligations, in addition to not realizing her "reasonable requests regarding scheduling," aided her decision to withdraw.  *Id*.  Plaintiff added she was unable to continue based on what she identified as "ethical misconduct."  *Id*.  She asked for the procedures to file a grievance, but did not explain who she was implicating, or what she was referring to.  *Id*.

Dr. Suzanne Woods also reached out to Plaintiff on March 31.  She called plaintiff, left a phone message, and sent an email.  Dr. Woods asked if Plaintiff was withdrawing, and also for an explanation of Plaintiff's conduct, which she characterized as both surprising and unprofessional.  "You have responsibilities to clients that given no notice, have resulted in an interruption of care.  In ethical terms this is patient abandonment. . . . Please contact Pam Iacco to set up a meeting with Dr. Tatchell, Ms. Jack and me."  Defs.' Mot. Summ. J. Ex. 16, at 2.  Plaintiff responded that she had "already started the withdrawal process from the Registrar," and asked to be contacted only by "written letter" or "email."  *Id*. at 1.  She also claimed that it was the lack of professionalism in the program that caused her decision not to continue.  Dr. Woods responded, offering another chance to meet to discuss any problems.  Plaintiff did not respond that day, but instead went to the registrar's office and withdrew from all her classes.  Pl.'s Dep. 192–93.

On April 1, 2009, Plaintiff finally responded to Dr. Woods' request.  Although Dr. Woods had suggested a meeting, Plaintiff wrote, "I will not be able to discuss the issue further with you until April 16."  Defs.' Mot. Summ. J. Ex. 18.  Dr. Woods wrote again on April 1, telling Plaintiff, "Waiting to meet is not acceptable" based on what had been suggested.  Defs.' Mot. Summ. J. Ex. 19, at 1.  Dr. Woods asked for a meeting before the end of the week, or at least a written summary of Plaintiff's concerns.  Plaintiff responded the next day that she was "unable to comply" with the request for a written summary or a meeting.  Defs.' Mot. Summ. J. Ex. 20, at 2.  At her deposition, Plaintiff testified she did not know why she had refused to meet until April 16, and that she had no pressing matters to attend to.  Pl.'s Dep. 198–99.

After Plaintiff withdrew from all her classes on March 31, the registrar's office requested her grades on April 2.  Because Plaintiff withdrew after March 27, she needed at least a "C-" grade or better to receive a "W" (withdrawn) on her transcript.  Defs.' Mot. Summ. J. Ex. 35, at 43.  A "W" does not affect a student's Grade Point Average (GPA).  Students with below a "C-" receive an "E" on their transcripts, a failing grade, which does affect their cumulative GPA.

Ms. Jack had begun the process of assessing Plaintiff's grade shortly after Plaintiff confirmed she was withdrawing on March 31.  Ms. Jack met with Ms. Lea that day, and was told Plaintiff would receive an "E" for her portion of the clinic.  Defs.' Mot. Summ. J. Ex. 4, at 50, 68.  Ms. Lea did not penalize Plaintiff for withdrawing, only for "not completing the standards that were set before her" in SLP's guidelines and standards of practice.  *Id.* at 68.  Ms. Jack then talked to Ms. Atkinson on April 1. 2009.  Defs.' Mot. Summ. J. Exs. 3, at 63; 5, at 112.  Ms. Atkinson also concluded that Plaintiff should receive an "E" because she was "not functioning as expected when compared to her peers at the same clinical experience level."  Pl.'s Resp. Summ. J. Ex. 6, at 8.  Ms. Jones emailed Ms. Jack, and told her that Plaintiff had a 100% for the

classroom portion of the clinical.  Pl.'s Resp. Summ. J. Ex. 4, at 3.  Although Plaintiff received 100% for the classroom portion of the class, when it was averaged with her clinical work, she received an "E" overall.  Pl.'s Resp. Summ. J. Ex. 4, at 4.  Ms. Jack said the grade was deserved "given [Plaintiff's] untimely presentation of required/reviewed documentation and the associated 'abandonment' of responsibility to the client…including completion of documentation."  *Id.* at 4. After Plaintiff received her grade, she emailed Ms. Jack on April 7.  She requested an explanation for the "E" "via written letter or email."  Pl.'s Resp. Summ. J. Ex. 5, at 4.  Ms. Jack did not respond, but forwarded the email to Dr. Woods and Dr. Renny Tatchell, the SLP department chair.  *Id.* at 5.

Days before, on April 3, 2009, Dr. Tatchell contacted Dr. Roger Coles, the Interim Dean of the College of Graduate Studies at CMU.  Dr. Tatchell recommended Plaintiff be dismissed from the SLP program because she did not meet the program's required technical standards, and had earned a failing grade in her practicum.  Defs.' Mot. Summ. J. Ex. 37.  Dr. Tatchell believed that Plaintiff's conduct constituted "patient abandonment" within the meaning of the terms in the Clinical Handbook.  Defs.' Mot. Summ. J. Ex. 6, at 58, 74.  Dr. Tatchell would have been open to consideration of Plaintiff's explanation for her conduct before he recommended Plaintiff's dismissal, *id.* at 74, but, as previously noted, Plaintiff refused to meet with him.  Defs.' Mot. Summ. J. Ex. 20, at 3.

Dean Coles received Dr. Tatchell's recommendation, and called to confirm his decision. Defs.' Mot. Summ. J. Ex. 7, at 11–12.  After Dr. Tatchell explained his recommendation that Plaintiff be dismissed, Dean Coles accepted the recommendation and dismissed Plaintiff from SLP.  *Id.* at 12.  At that time, Dean Coles had no knowledge that Plaintiff had made any comments about professionalism in the SLP program.  Defs.' Mot. Summ. J. Ex. 39, at 2.

Plaintiff was informed of her dismissal in an April 10, 2009 letter from Dean Coles.  Defs.' Mot. Summ. J. Ex. 38.

Then, on April 14, Plaintiff provided the written summary that had been requested almost two weeks earlier.  She emailed Dr. Tatchell and explained her concerns with the program.  Pl.'s Mot. Summ. J. Ex. 6, at 1–2.  Plaintiff stated that she did not receive enough guidance and supervision from Ms. Atkinson.  *Id*. at 2.  Plaintiff "had lost all confidence" in her ability to complete her clinical tasks.  *Id*.  She also demanded that her "E" be changed to a "W", with "no further action," so that she could "close this brief chapter in [her] life."  *Id*.

Plaintiff then called Dr. Tatchell on April 15, 2009.  Pl.'s Resp. Summ. J. Ex. 8, at 2.  He explained why she had received an "E" on her transcript, and directed her to the grade-grievance process at CMU.  *Id*.  Dr. Tatchell also received a voicemail from Plaintiff's husband, who threatened to take Plaintiff's issues to the dean and the "hiring/firing department in the university."  *Id*.

On April 16, 2009, Plaintiff emailed Dr. Tatchell and informed him "the grade grievance policy" was not a valid option for her.  *Id*. at 4.  Dr. Tatchell responded that it was entirely Plaintiff's choice whether she pursued that avenue.  *Id*.  Eventually, over two years later, Plaintiff filed this lawsuit.  Upon the Court's ruling that Defendants were entitled to summary judgment, Defendants filed a motion for sanctions.

## II

Federal Rule of Civil Procedure 11 establishes that "[e]very pleading, written motion, and other paper" submitted to a court by a represented party must be signed by an attorney of record.  Fed. R. Civ. P. 11(a).  The Rule goes on:

> By presenting to the court a pleading, written motion, or other paper — whether by signing, filing, submitting, or later advocating it — an attorney . . . certifies

that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

> (2) the claims, defenses, and other legal contentions are warranted by existing law or by nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after reasonable opportunity for further investigation or discovery.

Fed. R. Civ. P. 11(b).  The purpose of the Rule is to "deter baseless filings." *Elsman v. Standard Fed. Bank (Michigan)*, 238 F. Supp. 2d 903, 908 (E.D. Mich. 2003) (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990)).

Sanctions proceedings for violating Rule 11(b) can originate in two ways: by motion or at the initiative of the trial court.  When sanctions are requested by a party's motion, Rule 11(c)(2) requires that two procedures be followed.   First, the motion for sanctions must be made "separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b)."  Fed. R. Civ. P. 11(c)(2).  Second, to facilitate deterrence, the motion may not be presented to the court unless, within twenty-one days of service, the non-movant has not withdrawn or corrected the challenged behavior.  *Id.*

"If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction."  Fed. R. Civ. P. 11(c)(1). The test for imposing sanctions is "whether the individual's conduct was reasonable under the circumstances."  *Union Planters Bank v. L & J Development Co., Inc.*, 115 F.3d 378, 384 (6th Cir. 1997) (quoting *Lemaster v. United States*, 891 F.2d 115, 118 (6th Cir. 1989)).

**III**

Defendants filed their Rule 11 motion on October 31, 2012, asserting that Plaintiff's complaint violated Rule 11(b)(1), (b)(2), and (b)(3). Defs.' Mot. 3, n.1. Although filed after judgment had been entered in Defendants' favor, this is not fatal. *See Divane v. Krull Elec. Co.*, 200 F.3d 1020, 1025 (7th Cir. 1999) (the decision to impose sanctions "is left to the discretion of the trial court in light of the available evidence," even if concerning a post-judgment request for sanctions). The fact that Plaintiff has appealed the grant of summary judgment also has no bearing, as "the district court retains jurisdiction to resolve a motion for attorney[']s fees or sanctions even while an appeal of the merits is pending in the court of appeals." *Reg'l Refuse Sys., Inc. v. Inland Reclamation Co.*, 842 F.2d 150, 156 (6th Cir. 1988) (citation omitted) *superseded on other grounds by Vance v. United States*, 182 F.3d 920 (6th Cir. 1999).

Defendants served Plaintiff with their motion for Rule 11 sanctions on June 8, 2012. *See* Defs.' Mot. 5; Pl.'s Resp. 1. Just under two weeks later, Plaintiff stipulated to the dismissal of her equal protection claim and Defendant CMU. *See* June 21, 2012 Stipulation & Order, ECF No. 52. Plaintiff did not, however, abandon her other two claims against the six individual Defendants. Defendants have complied with the two requirements of Rule 11(c)(2): their motion for sanctions was distinct from all other matters, and it was served upon Plaintiff well over twenty-one days before it was presented to the Court.

Upon review of Defendants' motion and Plaintiff's claims against those Defendants, it is apparent that Plaintiff's claims were not supported by the evidence in the case, and sanctions are therefore appropriate.

**A**

Plaintiff's first claim was for retaliation in violation of the First Amendment. According to Plaintiff, she received a failing grade and was dismissed from CMU's speech pathology

- 10 -

program not because of her substandard performance, but because she raised an ethical complaint. To support a First Amendment retaliation claim, a plaintiff must show the following elements:

> (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury likely to chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

*Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998). Upon establishing that protected conduct was a motivating factor behind a defendant's actions, the burden shifts to that defendant. *Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999) (citing *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285–86 (1977)). If Defendants can show that they would have taken the same action in the absence of the protected activity, they are entitled to summary judgment. *Thaddeaus-X*, 175 F.3d at 399.

Assuming for the sake of argument that Plaintiff could satisfy her prima facie case, there is no tenable position that can overcome this fact: the only other student enrolled in Defendants' SLP Program to abandon clients earned a failing grade and was removed from the program. Defendants were therefore entitled to summary judgment.

In 2005, a student enrolled in the SLP Program abruptly withdrew from the clinical practicum course without making accommodations for her clients and without providing advance notice of her withdrawal to the instructors. *See* J. Jack Aff. at 7; R. Tatchell Aff. at 2; B. Swartz Aff. at 5–6; R. Tatchell Dep. at 16.[3] This student's actions were *identical* to Plaintiff's, who missed her clinical appointments without notice. That student, like Plaintiff, received an "E" in the clinical practicum course. *See* J. Jack Aff. at 7; R. Tatchell Aff. at 2; B. Swartz Aff. at 5–6;

---

[3] Each is appended to Defendants' motion for summary judgment — Exhibit 26 (J. Jack Aff.); Exhibit 29 (R. Tatchell Aff.); Exhibit 48 (B. Swartz Aff.); Exhibit 6 (R. Tatchell Dep.).

R. Tatchell Dep. at 16.  That student, like Plaintiff, was removed from the program.[4]  *See* J. Jack Aff. at 7; R. Tatchell Aff. at 2.

Plaintiff knew that Defendants had taken the same action on essentially the same facts. The affidavits of Ms. Jack, Dr. Tatchell, and Dr. Bradford Swartz (the current Department Chairperson for the Department of Communication Disorders) were exhibits to Defendants' motion for summary judgment.  All three individuals confirmed that the only other student to abandon her clients and withdraw from the practicum received a failing grade and was removed from the SLP Program.  Plaintiff ignored this point in her response to Defendants' motion for summary judgment.  She has ignored this point in her response to Defendants' motion for sanctions.

Instead, Plaintiff argues that her actions did not constitute patient abandonment because she was only a "non-licensed student" and was "not bound by the ethical standards set by the American Speech-Language Hearing Association (ASHA)."  Pl.'s Resp. Summ. J. 10.  Even if this were true, Plaintiff was bound by the clinical handbook governing all CMU speech pathology students.[5]

The SLP clinical handbook provides that absent an emergency, graduate student clinicians "*must* personally arrange for a peer clinician to assume responsibility for assigned evaluation or therapy session."  SLP Handbook 2, ECF No. 21, Ex. 4 (emphasis added).  Plaintiff

---

[4] The student apparently "agreed to the removal" and left the program after meeting with Ms. Jack and Dr. Tatchell.  *See* J. Jack Aff. At 7; R. Tatchell Aff. at 2.

[5] Plaintiff has indicated that "there is no fact in the record that states she was ever provided [a clinical handbook], and Plaintiff would deny receiving one."  Pl.'s Resp. 6.  Whether Plaintiff received a physical handbook or not, it still governed the requirements for all graduate students in CMU's SLP Program.  Plaintiff attended an orientation for the graduate program where "the clinic handbook [was] the content of that inservice. . . . All of the policies . . . are presented in that inservice." Dr. Woods Dep. 14.  Further, a copy of the handbook "is available in the report writing room for all clinicians, graduate and undergraduate.  As well as there is a copy for check out in the Carl's Center."  *Id.*

did not do that.  After she withdrew from the program, her client K.A.'s appointments were cancelled for the entire week of March 30, 2009.  *See* Pl.'s Resp. Summ. J. Ex. 3, at 1.

The handbook establishes that the "[f]ailure to meet or provide alternate coverage for an assigned appointment is viewed as 'patient abandonment' which *will* result in verbal reprimand, lowering of a grade, or removal from clinical assignments."  *Id.* at 3 (emphasis added).  As noted, Plaintiff did not provide alternate coverage for her clients.  After Plaintiff skipped her client sessions and withdrew from the course, she did nothing to ensure the ongoing services her clients needed continued uninterrupted.  Regardless of whether ASHA's standards apply to Plaintiff as a student, CMU's clinical program standards do.  She did not respect those client standards.

Plaintiff received a failing grade and was dismissed from the program as a result.  She was treated like the only other student to act in such a manner; exactly how the clinical handbook said she would be.  Defendants were therefore entitled to summary judgment on the issue regardless of any protected activity.

Defendants are now entitled to sanctions because Plaintiff continued to maintain her retaliation claim and ignored the evidence.  Evidence she was aware of and did not respond to, only to advance the argument that she did not abandon her clients because she is only a student.[6]

**B**

Plaintiff next claims that Defendants' actions violated her due process rights.  Defendants took two actions — delivered Plaintiff an "E" for her clinical practicum grade, and dismissed her from the SLP program.  Both were warranted, and both comported with Plaintiff's due process rights.

---

[6] Moreover, Plaintiff is not to be confused with a naïve youth in her early twenties just because she is a student: at the time of her dismissal she was in fact a thirty-one year old mother of two who operated her own business on the side.

**1**

The evidence demonstrates that Plaintiff's instructors were within their authority in giving her a failing grade.      Course grading called for an average of the student's overall work. Ms. Jones gave Plaintiff a 100% for her classroom work.  Plaintiff received a 65% from Ms. Atkinson and a 29% from Ms. Lea.  Defs.' Mot. Summ. J. Exs. 22, at 3; 23, at 3.  Dr. Ratcliff gave no percentage, only indicated Plaintiff was doing "satisfactory" work.  The average of 100, 65, and 29 is just under 65%.  Under CMU's graduate school policy, 65% is a failing grade that merits an "E" if the class is dropped after the tenth week.  Defs.' Mot. Summ. J. Ex. 35, at 43. Plaintiff has not shown how Dr. Ratcliff's "satisfactory" assessment would change that average.

But even if Dr. Ratcliff's assessment would have bumped Plaintiff's grade above 70%, her conduct on March 30 clearly fell within the SLP handbook's definition of "patient abandonment."   According to the handbook, patient abandonment *will* result in "verbal reprimand, lowering of a grade, or removal from clinical assignments."  SLP Handbook 3, ECF No. 21, Ex. 4.  As has been recognized by the Sixth Circuit, teachers "must be given broad discretion to give grades," *Settle v. Dickson County Sch. Bd.*, 53 F.3d 152, 156 (6th Cir. 1995), and it is not for this Court to discern what grade Plaintiff should have received.

"Courts must accept, as consistent with due process, 'an academic decision that is not beyond the pale of reasoned academic decision-making when viewed against the background of [the student's] entire career at the University.'" *Moore v. Louisiana State Univ. & Agric. & Mech. Coll.*, 275 F.3d 1083, at *1 (5th Cir. 2001) (unpublished) (quoting *Wheeler v. Miller,* 168 F.3d 241, 250 (5th Cir.1999) (citation omitted)).  Plaintiff's grade is consistent with the work she did, her instructor's evaluations of that work, and CMU's grading policy.  It is therefore also consistent with due process.

Plaintiff argues her grade should have been higher because she had received better marks over the course of the semester.  She argues her grade was reduced only because she withdrew. But Plaintiff continues to ignore the point: abandoning her clients, and failing to ensure their uninterrupted care, inevitably led to a lowered grade.  Her grades were reduced not because she decided to drop the course, but because she dropped her clients in the process.

Plaintiff also had ample opportunity to appeal her grade.  She simply chose not to. Plaintiff argues that she did attempt to follow the grade-appeal process, but that her attempts were stonewalled.  To be clear, this is the email that Plaintiff wrote to Ms. Jack on April 7, 2009: "Ms. Jack, If you are the individual responsible for placing an E on my transcript for clinical practicum, please provide me with an explanation via written letter or email."  Pl.'s Resp. Summ. J. Ex. 5, at 3.

Dr. Tatchell emailed Plaintiff on April 14, 2009 to specifically explain the grade grievance procedure: "I wanted you to know you have the right to appeal your grade through the grade grievance process at CMU. You should check page 45 of the graduate bulletin (2008-2009) for details on the grade grievance policy.  Let me know if you have any questions."  Pl.'s Resp. Summ. J. Ex. 6, at 4.  Plaintiff responded that evening, indicating that she was unaware of who was responsible for delivering her failing grade.  Pl.'s Resp. Summ. J. Ex. 8, at 4.  "I could not tell if it was Ms. Jack because she never replied to my *question*."  *Id*. (emphasis added). Plaintiff did not indicate that she had attempted to initiate the grievance process in any way.

Dr. Tatchell wrote back to Plaintiff the next day:

> Ms. Jack is responsible for assigning the grades . . . . If you want to pursue a grade grievance you should contact her and try to resolve the grade with her.  If the calculation of the grade is not explained to your satisfaction and you wish to pursue the grade grievance, you need to make an appointment with Ms. Jack and me.

- 15 -

*Id*. Plaintiff did not write to Dr. Tatchell and inform him that she had been rebuffed by Ms. Jack and needed to set up a meeting with him instead. Quite the contrary, she responded, "I feel the grade grievance policy is not a valid option at this time." Pl.'s Resp. Summ. J. Ex. 8, at 4. Dr. Tatchell then reminded Plaintiff once again concerning the grievance policy. "As far as the grade grievance is concerned, I outlined the steps you can take. It is entirely up to you whether or not you initiate the process." *Id*.

There is no dispute. Plaintiff had an opportunity to contact Ms. Jack to discuss her grade once she learned that Ms. Jack was responsible for delivering it. She did not.[7] She knew the next step was to contact Dr. Tatchell to set up a meeting. She did not do that either. Plaintiff, with this knowledge, is in no position to argue she was denied due process. Her grade comported with her performance and CMU standards, and she decided not to pursue the process that was available to appeal the grade. Therefore, her claim is not supported by the evidence, and sanctions are warranted.

**2**

Plaintiff next opposes her dismissal, claiming she had a fundamental right and interest in continuing her education. Pl.'s Compl. 12. As with her other claims, this allegation lacks merit. Plaintiff has submitted a complaint, signed by her attorney, that garnered no support from discovery. Sanctions are fully appropriate here as well.

The substantive due process clause protects against "government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). After formulating the asserted right, the court must ask whether it is "deeply rooted in this

---

[7] In her deposition, Plaintiff claims that she attempted to call Ms. Jack again in "May of 2009." Pl.'s Dep. 173. But this occurred after she had already informed Dr. Tatchell that she would not be pursuing a grade-grievance. Even if this was her first step in the grievance process, she never attempted to meet with Dr. Tatchell to advance the process from there.

Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it was] sacrificed." *Id*. at 720–21 (citations omitted).

Plaintiff's asserted right is to an accredited graduate school education. "Although students may have some substantive due process rights while they are in school, education itself is not a fundamental right." *Dunn v. Fairfield Cmty. High Sch. Dist. No. 225*, 158 F.3d 962, 966 (7th Cir. 1998). Moreover, the right to a graduate school education is not deeply rooted in this nation's history and traditions. "In fact, the Supreme Court has held explicitly that the right to attend public school is not a fundamental right for the purposes of due process analysis." *Seal v. Morgan*, 229 F.3d 567, 575 (6th Cir. 2000). Plaintiff's substantive due process claim concerning her dismissal is untenable, this is clear from the controlling authority.

Plaintiff also claims her procedural due process rights have been violated. *Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78 (1978), establishes the standard for procedural due process in the context of academic decisions. There, the plaintiff was dismissed for academic reasons without receiving a hearing. *Id.* at 79–80. The Supreme Court, without deciding whether the plaintiff had a protected liberty or property interest in continuing her education, rejected her argument. The Court held that, when dismissing a student for academic reasons, a university need not hold a hearing. *Id.* at 85, 89–91. A university meets the requirements of procedural due process so long as the dismissal decision is "careful and deliberate." *Id.* at 85.

Defendants' decision to dismiss Plaintiff from the program was careful and deliberate. She was offered meetings in which to explain both her conduct and her accusations on numerous occasions. Indeed, Defendants begged her to meet with them. Dr. Woods asked Plaintiff to set up a time to discuss her claims on March 31, April 1, and April 2. Pl.'s Resp. Summ. J. Exs. 2–

4.  Plaintiff responded that she was not able "to discuss the issue further" until April 16.  Pl.'s Resp. Summ. J. Ex. 3, at 3.  Dr. Woods told Plaintiff that "[w]aiting to meet is not acceptable." *Id*. at 8.  She asked Plaintiff to set up an appointment, or to at least submit a written complaint. *Id*.  Plaintiff refused.  Pl.'s Resp. Summ. J. Ex. 4, at 7.  Dr. Tatchell, who ultimately recommended Plaintiff's dismissal, testified concerning those potential meetings:

> [Plaintiff] had an opportunity to come in.  In fact, she had an invitation from Dr. Woods to come in and talk to Jane Jack, Dr. Woods and myself.  And that meeting was, at least in my mind, was very much open-ended and concerned her leaving the program and as I say abandoning the clients.  And justification for making this recommendation was on the basis of many of the things that I've talked about.

Defs.' Mot. Summ. J. Ex. 6, at 74.  Before Dean Coles signed off on Plaintiff's dismissal, he called Dr. Tatchell to ensure the decision had been considered at length.  Defs.' Mot. Summ. J. Ex. 7, at 11-12.  Dr. Tatchell confirmed that it had been.  *Id*.  This is just the sort of careful, deliberate decision that is appropriate in the context of graduate education.

The fact that Plaintiff was not expressly notified of Defendants' intention to dismiss her from the program before the decision was made also did not violate her due process rights. Plaintiff was told her actions were unprofessional, and constituted patient abandonment.  The clinical handbook clearly establishes that patient abandonment can result in dismissal from the program.  As established in *Hill v. Univ. of Kentucky*, 978 F.2d 1258 (6th Cir. 1992) (unpublished), "due process is satisfied in the case of an academic dismissal if the school fully informed the student of the faculty's dissatisfaction . . . as well as the dangerous consequences this posed to his enrollment; and, if the ultimate decision to dismiss the student was careful and deliberate."  *Id*. at *5 (citing *Horowitz*, 435 U.S. at 90).  Plaintiff knew the faculty was dissatisfied with her conduct.  She took risks with clients that were prohibited.  The subsequent decision to dismiss her was careful and deliberate.  Due process was satisfied.

- 18 -

Additionally, Plaintiff made the decision to leave the program long before she was formally dismissed.  This decision was made at least by 7:18 a.m. on Monday, March 30, 2009.  Plaintiff indicated it may have been determined even earlier.  That day, Plaintiff emailed her professor and indicated she was "not continuing with the program."  E-mail from Plaintiff (March 30, 2009), ECF No. 21 Ex. 2, at 2.  She also emailed Ms. Jack and explained she was "in the process of withdrawing from [the] program."  E-mail from Plaintiff (March 31, 2009), ECF No. 21, Ex. 3, at 2.

The letter Dean Coles sent informing Plaintiff of her dismissal contained the following language: "If you have any questions or there is any way that I can be of help to you, please do not hesitate to contact me."  Defs.' Mot. Summ. J. Ex. 38.  Plaintiff met with Dean Coles in May 2009 in order to "appeal [her] removal from the program."  Pl.'s Dep. 174.  Dean Coles specifically told Plaintiff "the person you need to see regarding the dismissal is Dr. Masterson."  R. Coles Dep. 30.  Dean Coles then set up a meeting between Plaintiff and Tom Masterson.  Plaintiff later cancelled the meeting with Dr. Masterson, and she never contacted him.  Pl.'s Dep. 169.

The Supreme Court has not required an opportunity to be heard before a student is dismissed from a program for academic reasons.  The plaintiff in *Horowitz* was only allowed to appeal the decision to dismiss her after that decision had been made; which she did in writing.  Plaintiff had that opportunity here.  For whatever reason, she just did not pursue it.

Plaintiff argues that her case is different from the one addressed by the Supreme Court in *Horowitz*.  She argues that in that case, the plaintiff "had been notified of her unsatisfactory performance, was on probation, and was allowed to appeal *twice*."  Pl.'s Resp. 10 (emphasis in original).  But Plaintiff mischaracterizes the circumstances of *Horowitz*.  The plaintiff there did

- 19 -

not have the opportunity to appeal the decision to dismiss her twice.  Her first appeal concerned

"the decision not to permit her to graduate."  *Horowitz*, 435 U.S. at 81.  She later appealed the

decision that she be disqualified from the school "in writing to the University's Provost for

Health Sciences."  *Id*. at 82.  The plaintiff initiated the appeal *after* she had been dismissed from

the program.  As noted above, Plaintiff had the same opportunity.

In determining that such a process satisfies a plaintiff's due process rights, the Supreme

Court reasoned in *Horowitz*,

> The decision to dismiss respondent . . . rested on the academic judgment of school
> officials that she did not have the necessary clinical ability to perform adequately
> as a medical doctor and was making insufficient progress toward that goal.  Such
> a judgment is by its nature more subjective and evaluative than the typical factual
> questions presented in the average disciplinary decision.  Like the decision of an
> individual professor as to the proper grade for a student in his course, the
> determination whether to dismiss a student for academic reasons requires an
> expert evaluation of cumulative information and is not readily adapted to the
> procedural tools of judicial or administrative decisionmaking.

*Id*. at 89–90.  The Court went on, "we decline to ignore the historic judgment of educators and

thereby formalize the academic dismissal process by requiring a hearing. . . . We recognize . . .

that a hearing may be 'useless or harmful in finding out the truth as to scholarship.' "  *Id*. at 90

(quoting *Barnard v. Inhabitants of Shelburne*, 102 N.E. 1095, 1097 (Mass. 1913)).

Plaintiff reads *Horowitz* and concludes that the Supreme Court did not "do anything to

undermine long-standing precedent that procedural due process requires notice and an

opportunity to be heard."  Pl.'s Resp. 11.  Plaintiff then cites *Flaim v. Med. College of Ohio*, 418

F.3d 629 (6th Cir. 2005) for the proposition that the accused must have the opportunity to

"respond, explain, and defend."  *Id*. at 635 (citation omitted).  Plaintiff does not address the

apparent distinctino: *Flaim* involved a plaintiff who had been dismissed for disciplinary reasons,

not academic reasons.  *Id*. at 632.  The Supreme Court in *Horowitz* noted the inherent differences

- 20 -

between those situations. *Horowitz*, 435 U.S. at 87 ("there are distinct differences between decisions to suspend or dismiss a student for disciplinary purposes and similar actions taken for academic reasons *which may call for hearings in connection with the former but not the latter.*") (emphasis added).

As with Plaintiff's grade, Plaintiff's dismissal was well-reasoned, deliberate, and supported by the evidence. Further, there was a recognized procedure to appeal her dismissal through CMU. Dean Coles even arranged an appointment to be sure Plaintiff was on that track. She never appeared or contacted Dr. Masterson to pursue the issue. Plaintiff's counsel knew this information at least at the point of Plaintiff's and Dean Coles' depositions. Yet he pursued Plaintiff's due process claims even after Defendants informed him of their intention to seek sanctions. Sanctions are appropriate because Plaintiff's meritless claims were not abandoned.

## C

In her response to Defendants' motion for sanctions, Plaintiff also asserts that the Court granted summary judgment without considering the facts in the light most favorable to her — the appropriate standard of review when addressing a motion for summary judgment. Although not completely germane to Defendants' motions for sanctions, the assertion does highlight Plaintiff's explanation of the facts.

However, many of the points Plaintiff claims were not considered favorably to her have been discussed. For example, Plaintiff claims that she was an "A" student at the point she withdrew, and therefore deserved a "W" on her transcript, not an "E". Plaintiff's claim — that the "inference to be drawn from this evidence" is that she was "easily passing" — is contradicted by the record. As noted above, Plaintiff's grade was not an "A". It was a "D".

Plaintiff suggests the Court erred by "accept[ing] these grades at face value." Pl.'s Resp. 5. Discussed at length, grade reduction was warranted because she abandoned her clients. Plaintiff does not rebut this fact and simply believes that the grades were reduced solely because she withdrew from the practicum. It is well-established that "[c]onclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). *See also Twombly v. Bell*, 550 U.S. 544, 555 (2007) (explaining that a complaint must contain something more than a statement of facts that merely creates speculation or suspicion of a legally cognizable cause of action).

Plaintiff goes on. She does not believe that the Court should have concluded that "Plaintiff committed an ethical violation of 'patient abandonment.'" Pl.'s Resp. 6. But as noted above, according to CMU's policy and Plaintiff's instructors, she did. Plaintiff disputes whether she ever received a clinical handbook. *Id.* She was nonetheless bound by it regardless, as were all her fellow graduate students, and she had access to multiple copies. Plaintiff asserts she did attempt to appeal her grade, but decided not to go forward because it would be "futile." *Id.* at 7. But she never made any attempt to challenge the grade beyond the two-line email to Ms. Jack which she characterized as a "question." Even if that was the first step toward an appeal, she never contacted Dr. Tatchell, or anyone else, to advance the process. She cannot now claim those attempts would have been futile — she never tried.

Plaintiff also makes a few claims that have not been previously addressed. For example, she claims that "only a D- or better was needed for a 'W'" on her transcript because a publication from the Registrar establishes that "CMU policy is that for withdrawals after the automatic cutoff point, a 'W' was still to be given for a grade of D- or better." *Id.* at 4. The evidence contradicts this assertion. Stated succinctly by the graduate bulletin, "There is *no grade*

*of D in the graduate marking system.*  When a D grade is assigned to a graduate student, the Registrar's Office will convert the grade to an E before recording it on the student's permanent record."  Defs.' Mot. Summ. J. Ex. 35, at 43 (emphasis added).  Plaintiff's complaint indicates she understood this to be the case: "CMU's policy . . . stated that if a student withdrew at that point in the semester, she would receive a 'W' for 'withdraw' if she was performing passing work 'of C- or better' at the time of withdrawal; and 'E' for failing work."  Pl.'s Compl. ¶ 22. The attempt to argue she only needed a "D-" is disingenuous.

Plaintiff asserts that Ms. Jack submitted an "E" for Plaintiff's grade "before *any* of the clinical instructors submitted their grades or gave input about documentation."  Pl.'s Resp. 5. But Ms. Jack's affidavit, supported by the other evidence outlined above, indicates that Ms. Jack made this determination "based on the verbal assessments from [Plaintiff's] four clinical instructors in CDO 749 (Kathryn Atkinson, Sue Lea, Ann Ratcliff, and Theresa Jones), all of whom [she] had discussions with regarding [Plaintiff's] grade on either March 31 or April 1, 2009."  J. Jack Aff. 3.  Plaintiff offers nothing to undermine the conclusion that the grade was entered only after verbal feedback from every instructor.  Such a decision is not a substantial departure from accepted academic norms.[8]

Again, it should be emphasized that federal courts are not well-suited to evaluate the substance of academic decisions made by faculty members, decisions which require "an expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of

---

[8] Plaintiff also advances three other errors.  First, that the Court considered the statements of Marie Kenworthy, an undergraduate student who highlighted Plaintiff's substandard abilities as a clinician.  But Ms. Kenworthy's statements only support the faculty's determination that Plaintiff deserved a failing grade — Plaintiff's grade was in no way based on Ms. Kenworthy's statements.  Plaintiff also highlights two issues that were not discussed by the Court in ruling on the motion for summary judgment: the instructors' consideration of alleged HIPAA violations and Plaintiff's failure to timely submit required documentation.  These issues need not be discussed, however, because lowering Plaintiff's grade was supported by her actions of client abandonment alone. Further, as noted when it was discovered that HIPAA violations had not occurred, that "does not change the grade."  Pl.'s Resp. Summ. J. Ex. 10, at 1.

judicial or administrative decision-making." *Ewing*, 474 U.S. at 226 (citation omitted). "Courts must accept, as consistent with due process, 'an academic decision that is not beyond the pale of reasoned academic decision-making when viewed against the background of [the student's] entire career at the University.'" *Moore*, 275 F.3d 1083, at *1 (quoting *Wheeler*, 168 F.3d at 250 (citation omitted)). Plaintiff has not shown that her professors showed a lack of professional judgment. Their decision to fail her, and then dismiss her, is supported by her work in class, her client-abandonment, and then her disinterest in meeting to discuss the issues she had raised.

## D

Because Plaintiff brought a frivolous lawsuit which lacked evidentiary support, and continued to pursue her claims once the lack of support was evident, sanctions are appropriate. Therefore, the final determination is in what amount. But before this issue is decided, two affidavits submitted by Plaintiff should be addressed.

Plaintiff filed an ex-parte motion to submit two affidavits in support of her response to Defendants' motion for sanctions, which was granted. The affidavits are from David Kotzian and Philip Green, two practicing attorneys with admirable credentials. Both attorneys believe sanctions are not warranted in this case. Mr. Kotzian explains that "The vast majority of [First Amendment] cases must be proven by reasonable inferences, and evidence demonstrating that the Defendant's alleged reason for the adverse decision was a pretext." Kotzian Aff. ¶ 10, ECF No. 87. The Court has no difficulty, anecdotally, with that proposition.

Mr. Green has been involved with civil rights cases for years, particularly regarding academic matters. He opines,

> In academic cases the facts related to contested decisions are peculiarly within the possession of the defendant, and so plaintiff's lawyers of necessity must rely on their clients as the source of information in most cases. In some cases documents are available to the client and therefore to the lawyer. In this case, limited

- 24 -

information was available and to the extent it was available it merited further inquiry through litigation and the use of discovery tools.

Green Aff. ¶ 11, ECF No. 87.  The attorneys' points are well-made, and they are quite correct. In this case, the Court does not know what Plaintiff told her attorney about the case.  It may have merited further inquiry through discovery.

But as the evidence unfolded, it became clear that Plaintiff did abandon her clients within the meaning of CMU's clinical requirements.  Even if Plaintiff could establish an unlawful motive on Defendants' part, a questionable proposition, in the Court's view the record shows that Defendants have failed and dismissed students who abandon clients as Plaintiff did.  Plaintiff knew all of this at least as early as Defendants filed their motion for summary judgment in May 2012.  In fact, this is likely why Plaintiff's equal protection claim was abandoned.  Abandoning the First Amendment retaliation claim for the same reason would have been prudent.

Mr. Kotzian asserts that assessing sanctions against a student or her counsel "for pursuing a good faith claim of unlawful conduct would most certainly have a chilling effect on future lawsuits and lead to the danger of potential abuses by education institutions."  Kotzian Aff. ¶ 13. Mr. Green similarly establishes that a successful motion for sanctions "would have a deleterious impact on the evolution of the civil rights laws."  Green Aff. ¶ 10.  Perhaps.

Of course, the Court does not agree that Plaintiff's claims are meritorious.  However, there are competing concerns that must be acknowledged.  Should every institution of higher education be forced to ante up $100,000 for legal defenses when a student feels she does not deserve a failing grade?  Or decides that grievance procedures and school-sponsored appeals should make way for federal lawsuits?  A modest sanctions award will not have a chilling effect on future lawsuits that have merit, only those that should not be pursued once the relevant facts are established.

This Court has broad discretion in determining an appropriate sanction. *Dobenhamer Bldg. Corp. v. Architectural Research Corp.*, 873 F.2d 109, 114 (6th Cir. 1989).  Defendants served Plaintiff with their Rule 11 motion on June 8, 2012, and Plaintiff had the benefit of the 21-day safe-harbor provision.  As such, it is appropriate to compensate Defendants with attorney's fees and costs incurred from June 29, 2012 onward.

Defendants have submitted a detailed accounting representing the attorney's fees and costs they have expended.  The fees and costs incurred after June 29, 2012 total $11,641.25 ($11,582 for attorney's fees and $59.25 in costs).  The court shall award the "lodestar fee," the hours reasonably expended multiplied by a reasonable hourly rate. *Adcock-Ladd v. Secretary of Treasury*, 227 F.3d 343, 349 (6th Cir. 2001).  A review of the declaration of Defendants' counsel and the attached time records, *see* Defs.' Mot. Exs. A, 2, indicates that the time spent on this matter was reasonably expended.  Further, the rates charged by Michael Cavanaugh and Ryan Kauffman are reasonable in the relevant community for the work performed.

## IV

Accordingly, it is **ORDERED** that Defendants' motion for sanctions, ECF No. 79, is **GRANTED** in part and **DENIED** in part.

It is further **ORDERED** that Defendants are awarded $11,641.25 in attorney's fees and costs.  Plaintiff's counsel, and not Plaintiff herself, is **DIRECTED** to pay the awarded fees and costs to Defendants' counsel no later than **March 1, 2013**.

Dated: January 25, 2013

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 25, 2013.

s/Tracy A. Jacobs
TRACY A. JACOBS